UNITED STATES DISTRICT COURT
FOR THE NEW HAMPSHIRE DISTRICT

|  |  |  |
|---|---|---|
| Coronavirus Reporter | ) ) ) | |
| Plaintiff, | ) ) | Case 21-cv-47-LM |
| vs. | ) ) ) | |
| Apple Inc. | ) ) | **PLAINTIFF'S OBJECTION TO VENUE TRANSFER AND** |
| Defendant. | ) ) ) ) ) ) ) | **MEMORANDUM OF LAW IN OPPOSITION TO APPLE'S MOTION** |

## PLAINTIFF'S OPPOSITION TO VENUE TRANSFER

Plaintiff Coronavirus Reporter respectfully objects to Defendant Apple's Motion to Transfer Venue. Apple's motion pursuant to 28 U.S.C. § 1404(a) does not acknowledge Sherman Act 15 U.S.C. § 22, which statutorily mandates that any suit proceeding under antitrust laws against a corporation may be brought in any district where it transacts business.

Simultaneously filed in support of this objection is Plaintiff's Memorandum of Law.

WHEREFORE, Coronavirus Reporter requests that this Honorable Court

A. Deny the Motion to Transfer Venue in Entirety

Respectfully submitted, this 25th day of March 2021.

/s/ Keith Mathews
Keith Mathews
NH Bar No. 20997
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO APPLE'S MOTION TO TRANSFER VENUE UNDER 28 U.S.C. 1404(a)

## I. PRELIMINARY STATEMENT

1. The Coronavirus Reporter app was developed in February 2020 to capture and obtain critical biostatistical and epidemiological data as it happened. For the first time in the history of pandemics, social media could provide new insights of an entire population that simply could not be obtained from traditional doctor office visits and other screening methods. Months of early pandemic data were lost, and Plaintiff's business improperly shutdown, when Apple summarily rejected the Plaintiff's app for purportedly lacking "deep-rooted" medical credential. This was in spite of the fact that Dr Robert Roberts, Plaintiff's co-founder and Chief Medical Officer, is an incontrovertible authority with regards to medical screening technologies.

2. In the present motion, Apple interestingly raises contract language that they maintain "sole discretion" to reject any app, attempting to cast this controversy as purely contractual in nature. Apple writes off Plaintiff's arguments that they are a gatekeeper to the internet as "grandiose." [1] At a time when many experts assert Big Tech regulation – or even breakup – is inevitable, Plaintiff rather seeks a minimal civil injunction to allow any "reasonable, legal app." Other lawsuits pending bench trial are demanding entire new App Stores. As argued herein, Apple now strives to reduce Plaintiff's arguments about

---

[1] Apple halting the public health contributions of Nobel Fields Medal Director and NASA Chief Cardiologist Dr Roberts in February 2020, before any serious coronavirus efforts were underway in the United States, appears to be the only grandiose posturing in the facts of this case. Although we will unfortunately never know, Plaintiff submits the early availability of a high-quality interactive application, under Dr Roberts' supervision, may have fundamentally altered initial public resistance to and acceptance of the pandemic.

reasonable internet access, to one of contractual dispute on "sole discretion," to get the venue they want. Plaintiff has specifically pleaded that many Apple consumers simply cannot afford to easily switch devices, or to miss out on school or work compatibility, and thus have little freedom to stray from Apple devices. Apple is indeed a gatekeeper to internet access in those cases, and many others. This dispute must be treated as the antitrust matter that it is, predominately, which supports staying in the present venue.

3. In light of the fact six other antitrust lawsuits are pending and consolidated in Northern California, Apple requests venue transfer because they claim their forum selection clause mandates it, and in case it doesn't, as backup they file over twenty pages of opinion arguing 28 U.S.C. 1404(a) warrants a change of venue. They don't mention the six antitrust Plaintiffs in Delaware, or the six witnesses in the present lawsuit. In this early stage of national discussion, and litigation, surrounding Big Tech omnipresence, it is inappropriate to designate Northern California as the epicenter for all budding claims.

4. Absent anywhere in Apple's motion – which required judicial consent to exceed local page length limits – is mention of the statutorily mandated right for Plaintiff to proceed in "any district where [Apple] transacts business." Sherman Act 15 U.S.C. § 22.

## II. Background

12. Apple requires its developers to sign a forum selection clause setting Northern California as the venue for any disputes arising out of the contract between parties.

13. None of Plaintiff's key witnesses live in California. At least one lives in New Hampshire. Another lives near the Vermont border. One key witness is a dual resident of Arizona and Ottawa, Canada. Several others are on the east coast. As the Amended Complaint states,

class action certification is likely to be sought in this proceeding. Of note, at least half a dozen different rejected apps currently underly the claims in this lawsuit will be incorporated as class participants, co-plaintiffs, and/or discovery witnesses. None of these apps have developer teams or witnesses in California. It is expected that, should this matter be certified as a class action, California based companies would be a minority of the class participants.

### III. LEGAL STANDARD

14. Apple asserts that the governing legal standard here is 28 U.S.C. § 1404(a). It must be acknowledged that the statutory venue law is Sherman Act 15 U.S.C. § 22, which grants Plaintiff the right to file and proceed in this district.

15. When drafting the Sherman Act, it is noteworthy that the lawmakers gave Plaintiff a choice of either the district where a monopoly is located, *or,* any district where it transacts business. This intentional choice should not be disregarded by the Court, even though Apple's lengthy memorandum neglects to mention it.

16. Amongst other reasons, this choice exists because the home district of a monopoly may not be the best venue to enforce anti-competition laws. Here, Northern California is the land of "Big Tech," and it would be difficult, if not impossible, to find jurors who were not employed, or have a relative or close friend employed by Big Tech. There exists a valid concern that any lawsuit that may add to the momentum of breaking up, or regulating, Big Tech may not be treated fairly at trial.

### IV. ARGUMENT

**A. Apple's Forum-Selection Clause in Unenforceable**

17. Generally, forum-selection clauses were not favored by the courts. The Supreme Court changed this in 1972 with an admiralty ruling, *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 15 (1972)

18. In *Bremen*, a dispute over a drilling rig being towed from Louisiana to Italy was subject to a forum-selection clause. The Supreme Court held that there exist "compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power" should be enforced.

19. And therein lies the limitations to *Bremen,* in applying it to this case. This is an antitrust case that clearly pleads the existence of undue influence and overweening bargaining power.

20. Unlike *Bremen,* where hundreds of shipping companies existed, here the Amended Complaint asserts that 80% of all internet mobile revenue pass through Apple devices. There is one, or at most two, realistic choices to a developer who wishes to create a mobile application : Apple or Android. For these reasons, the exceptions noted in *Bremen* apply.

21. Citing *Huffington (637 F.3d),* Apple's motion substitutes the word "unconscionable" for "overweening," which, as best as Plaintiff can tell, was the original meaning construed in and derived from *Bremen*. The concern the justices raise in *Bremen* does and should apply here.

22. *Bremen's* holding is solely applicable to contract law. It does not override an antitrust statute setting a choice of venue. Nonetheless, it permitted exemptions of undue influence and overweening bargaining power, both of which are the case in the anti-competitive behavior alleged in the underlying complaint.

23. Apple asserts that the First Circuit "rejected the proposition" that a lack of an opportunity to negotiate a contract invalidates a forum-selection clause. Apple wrongly applies *Rivera v. Centro Medico de Turabo*. There, a terminally ill patient was bound to a forum-selection clause. The First Circuit reasoned that, despite the stressful circumstances, the patient-plaintiff still had a choice in hospitals. This is in contrast to the current case, where the essence of the antitrust claim is that there is only one – maybe two – possible providers of mobile app stores.

24. Stopping short of detailed analysis, Apple posits that courts "routinely" allow forum-selection clauses in antitrust matters, citing *Cung Le v. Zuffa, LLC*. However, further analysis reveals a dead-end for Apple's logic. See *Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1361 (2d Cir.1993)*(holding, as to whether plaintiffs' claims for securities violations were subject to a contractual forum selection clause, that only "if the substance of their claims, stripped of their labels, does not fall within the scope of the clauses, the clauses cannot apply"); see *also Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc.,949 F.Supp. 1427, 1433 (N.D.Cal.1997)* ("[T]he better view, and the one that is consistent with the Ninth Circuit approach adopted in *Manetti-Farrow*, is the one which upholds the forum selection clause where the claims alleged in the complaint relate to the interpretation of the contract.")

25. But here, the Sherman Act claims stand on their own, and are not simply elaborate contract claims. Indeed, the original complaint didn't mention breach of contract, only improper restriction to accessing the national internet backbone. Here, the Court must look at Apple's opportune timing, seeking to change venue after Plaintiff filed an Amended Complaint adding Breach of Contract and Good Faith Covenant claims. Hence

forum selection clauses may supercede in anti-trust cases that are, fundamentally, contractual disputes at their core. *Nextrade, Inc. v. Hyosung (Am.), Inc., 122 Fed.Appx. 892, 894 (9th Cir.2005)*. "The substance of a claim is what matters, not its title."

26. While the Amended Complaint charges Apple with breach of good faith, in determining Dr Roberts' exemplary CV didn't amount to "deep rooted medical credentials," the underlying anti-trust claim still exists independently: Apple arbitrarily and capriciously manages the App Store to benefit itself, even if that means restricting access to the national internet backbone. That claim stands on its own, and would exist whether or not the Apple Developer agreement dispute existed. **The fact that Apple forces developers to agree that it has "sole discretion" to regulate access to the internet (i.e. approve an app), does not defeat any and all Sherman Act claims, nor does it convert them all to contract claims.**

27. Apple attacks Plaintiff's anti-trust claim at its core for being "grandiose," [2] which seems surprising considering Plaintiff seeks far less intervention than other antitrust cases that are widely covered in national news, demanding entire new app stores. Plaintiff, rather modestly in comparison, merely argues that legal, reasonable apps be should allowed on the Apple App Store, still affording Apple some say in quality control and legal compliance. The logical conclusion here seems to be that Apple wishes to frame this case away from anti-trust law, at the expense of denigrating a Plaintiff who simply had a vision to help with a health crisis. To the extent Plaintiff had a Covid app ready months

---

[2] Until about a decade ago, computer developers wrote software applications and published their work to the public domain, or sold it in brick-and-mortar software shops. Apple changed the game by introducing the App Store, and a decade later, serious questions exist for our society. Should every inventor – here, Dr. Roberts, a famous NASA and Fields Medal cardiologist – have to gain Apple's approval, or were the longstanding methods and freedoms enjoyed before the App Store better for society? Apple's counsel may indeed be onto something that this is a grandiose question, in that it is an important and theoretically pure antitrust claim that deserves judicial public policy scrutiny.

before others, or invented a test for heart attacks that saved countless lives, it is hardly appropriate for Apple to deride disappointment stemming from refused opportunity to help as "grandiose." Ironically, this comes from a company and industry that, for most of its existence, prided itself on disruptive technology.

**The public-interest factors do not favor transfer**

28. After incorrectly applying *Bremen*, and ignoring Sherman Act venue statutes, Apple then proceeds with a lengthy 1404(a) analysis of public interest.

29. Apple suggests that Northern California is the venue for the majority of antitrust claims against Apple. This is not the case. *Blix v. Apple* (19-cv-1869-LPS), in the Delaware district, appears to have been filed prior to most or all of the pending Northern California cases. *Blix* appears to be assembling a class action as well, and presently also has around half a dozen co-plaintiffs. Of interest, neither Blix's attorneys at Quinn Emmanuel, nor Apple's attorneys at Gibson Dunn, have sought to transfer venue in that case.

30. *Blix* has actively encouraged developers to come forward and speak out against Apple's anticompetitive App Store policies. There exists some significant overlap between *Blix's* allegations and those of Plaintiff's. Namely, upon information and belief, Apple routinely demotes and downgrades App Store rankings for developers whom it does not favor. While Coronavirus Reporter faced outright rejection, many apps are approved, formally, but intentionally de-ranked to the point they are effectively restricted from the iOS userbase. Another overlapping allegation is that Apple employs cronyism, favoring apps of friends and strategic partners.

31. The cases in Northern California, namely *Epic*, concern an entirely different subject – the allocation of profits to already immensely profitable apps such as *Epic Fortnight*. It is

henceforth clear that discovery, contrary to Apple's suggestion, will cover almost entirely different aspects of Apple's internal workings. For example, Plaintiff anticipates discovering records of all rejected apps, and the documentation surrounding the disallowance. Likewise, Plaintiff anticipates discovering ranking algorithms, and Apple's ability to "put their finger on the scale" of any App developer who falls into disfavor. Lastly, Plaintiff intends to discover documents and contact link analysis to support allegations of cronyism and corruption in the App Store.

32. There exists little reason to consolidate with seemingly unrelated cases pending in Northern California. Although some discovery efforts could be combined in Delaware, that case also has fundamental differences from the underlying lawsuit. Namely, it involves intertwined patent disputes, and non-mobile customer userbases. *Blix* also bases its antitrust allegations on different facts and theories than does Coronavirus Reporter.

33. In sum, Apple's attempt to conveniently portray Northern California as the ideal venue for every future antitrust action fails, because many other plausible cases are progressing without obstacle outside California, and Plaintiff's case concerning stifling a startup has little, if anything, to do with Apple's multi-billion dollar revenue fight with Epic.

34. Further differentiating this case from the others is the fact it centers on pandemic response, and Apple's ability to restrict medical researchers and shape public health response. There is an undeniable health care component to this case that simply does not exist in any other current litigation against Apple, and will likely require oversight authority from the Court. This Honorable Court is as capable, if not more capable, to handle these public health considerations than is the venue cherry-picked by Apple.

35. For all of the above reasons, Apple should abandon their judicial economy argument[3]. Other than asking the Court to take their word for it, Apple has not provided substantiated proof of how their motion would improve judicial economy. Alternatively, Apple should, at their own cost, present to the Court documentation of every single antitrust and health care case pending, in any jurisdiction, and provide specific evidence for how each different venue could benefit judicial economy. Absent such thorough analysis, one has the impression from reading Apple's motion that they have indeed cherry picked a venue.

36. Apple routinely litigates patent disputes in districts outside California, and there does not seem to be a valid reason why antitrust disputes cannot likewise be handled by non-California federal courts. Apple has lost a significant number of patent disputes in such outside venues. Were Apple permitted to force all IP disputes to Northern California, it seems clear that many smaller entities would not have succeeded.

37. The relevance here to intellectual property litigation is non-trivial. As alleged, a developer-researcher, like Plaintiff's Dr. Roberts, is restricted from sharing his invention, because Apple restricts access to the national internet backbone. Apple requires all app submissions to be accompanied by a signed forum-selection clause. As such, the inventor-developer has no choice but to either sign the forum-selection clause, or forego any chance of accessing the iOS userbase.

38. At this point, Plaintiff's claims should proceed as prescribed by the Federal Rules, rather than be wrongly cast by Apple into less potent contract claims. Whereas a patent holder

---

[3] Apple has rendered incompatible logic in its own motion. On one hand, that assert that they have absolute "sole discretion" to reject any app, which implies a contract determination of law by the Court that needs no witnesses. On the other hand, they have probably spent several hundred thousand dollars on this motion to change venue, purporting that a large group of witnesses in Cupertino would be inconvenienced to testify in New Hampshire. Such internally inconsistent positioning suggests dilatory tactics, and Plaintiff respectfully requests that this motion be deferred until Apple files an Answer, to avoid wasting resources of the Court and the parties. If Apple's Answer asserts they possess an unchecked right to block Dr Roberts' medical contributions, the venue transfer request is moot because no witnesses would be required.

has no relationship with Apple whatsoever, Apple effectively forces application developers into a Developer Agreement and then subjects them to arbitrary and capricious results.[4] This restraint of trade – not allowing the inventor-developer-researcher reasonable access to the iOS userbase, and by extension, the national internet backbone, violates the Sherman Act. This is the fundamental claim of the underlying action. As such, public interest discouraging anticompetitive behavior is paramount to ruling, at this early stage, in favor of the *status quo* Developer Agreement.

39. In the interest of brevity, Plaintiff enumerates the below arguments in additional response to Apple's conclusory public interest arguments:

   1) Much of the discovery in this case will be electronic discovery, which will be the same cost to all parties, regardless of venue.

   2) Plaintiff's attorneys are willing to travel to California to depose any Apple employees, if necessary.

   3) Moving the litigation to California simply shifts costs from Apple to Plaintiff. 1404(a) case law is well established that mere shifting convenience from one party to another is not valid reason to transfer venue.

   4) Indeed, the cost to litigate in Northern California may be prohibitive to Plaintiff and/or other similarly situated Plaintiffs. This counsel and/or his colleagues have previously litigated in California, which resulted in incremental *pro hac vice* expenses annualized at around $100,000 a year.

---

[4] Until the App Store was invented in 2008, and for the entire history of computing, software authors effectively served as independent inventors and intellectual property developers when they published their works in the public domain or sold them in software shops. Over time, Apple's App Store has so far distanced the independent developer-inventor from direct access to his or her audience, that critical commerce is restrained, in violation of the Sherman Act.

   California is a notoriously expensive district to litigate in, and an extra $200,000 in legal costs to Plaintiff (assuming a two-year process) is a prohibitively expensive requirement to a Plaintiff who had revenues reduced to zero as a result of anticompetitive practices.

5) Apple's rules and App Store policies affect nearly every New Hampshire consumer, and certainly, New Hampshire based developers. Coronavirus Reporter's chief software engineer is a Dartmouth-trained computer science doctorate. For these reasons, this Court has a vested interest in protecting the rights of its citizens and students. Moreover, New Hampshire has standing to oversee companies that limit Public Health responses for its citizens, as is the case here.

6) At this point in litigation, neither Apple nor Plaintiff has a final list of witnesses and/or app teams. Apple wrongly asserts judicial economy favors transfer because six cases are proceeding in Northern California. This simply doesn't hold up to scrutiny at this early stage in the litigation, especially considering Plaintiff's claims pertain to an equal number (six) of apps/parties, and an equal number are already in the Delaware district. This consideration should be denied, or at least, deferred until clarified in discovery.

40. For the foregoing reasons, Coronavirus Reporter respectfully requests that this Honorable Court deny Apple's motion in its entirety.

      Respectfully submitted, this 25th day of March 2021.

/s/ Keith Mathews
Keith Mathews
NH Bar No. 20997
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing was delivered electronically to counsel for the Defendants with counsel, and emailed to those without known counsel.

Executed on this 25th day of March 2021.

/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff